UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 17-10183-RGS

SAMIRA TRUST

v.

HARVARD UNIVERSITY

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

July 23, 2018

STEARNS, D.J.

Plaintiff Samira Trust brings a curated litany of claims against her former employer, Harvard University,[1] alleging, *inter alia*, gender and disability discrimination, retaliation, and interference with her rights under the Family Medical Leave Act (FMLA).  Harvard now moves for summary judgment on all counts of the Complaint.  For the reasons that follow, the motion will be allowed.

BACKGROUND

Trust was hired into the position of Academic IT Support at Harvard University's Faculty of Arts and Sciences (FAS) in the Division of Continuing

---

[1] The full name of the defendant is President and Fellows of Harvard College, named in the Complaint as Harvard University.

Education on March 30, 2015, having previously been employed as a part-time User Assistant in the same department.  *See* Pl.'s Responses to Def.'s Statement of Undisputed Material Facts, Dkt # 34, ¶¶ 3-4 (Pl.'s SOF).   The job entailed assisting students and university personnel with IT issues; the job description also included "working with an I.T. group to develop and resolve complex technical problems for a unit," and "working with managers to determine project deadlines and objectives."  *Id.* ¶ 8.  Trust was required to divide her time between two locations:  a Harvard facility at 53 Church Street in Cambridge, Massachusetts, where her supervisor was Pierre Julien, and Sever Library, also in Cambridge, where she reported to Mary Frances Angelini.  *Id.* ¶ 5.  Her offer letter stated that her "regular schedule [was] 35 hours per week, Monday through Friday, nine a.m. to five p.m. with one hour unpaid lunch every day."  Dkt # 28, Ex. A, Trust Dep. at 28: 5-10.  Trust does not dispute that her offer letter stipulated that she was expected to work from 9 a.m. to 5 p.m., but she considered the offer letter "just a formality."  Pl.'s SOF ¶ 13.

In the Fall of 2015, Harvard became aware that Trust was not reporting regularly for work; Julien would search for her without success at the two locations where she had a work space.  Dkt # 28, Ex. B, Julien Dep. at 86:18-24.  Both of her supervisors were led to believe that she was working with the

2

other, when in fact she was not.[2]  At her deposition, Trust conceded that at the time she worked "really odd hours," that some days she would work in the evenings, and on others only until 2 p.m.  Dkt # 28, Ex. A, Trust Dep. at 30:24, 50: 16-18.  She also stopped attending the required staff meetings after September 8, 2015, Pl.'s SOF ¶ 19, because she could not access her email to learn about the meetings and often had conflicting doctors' appointments.[3]  She did not deny knowing that attending the meetings was a requirement of her position.  Dkt # 28, Ex. A, Trust Dep. at 38:10-23.

Harvard suspected that Trust was completing timesheets for work that she was not performing and, concerned that her sporadic attendance was

---

[2] Throughout her Opposition to Harvard's Motion for Summary Judgment and her Response to Harvard's Statement of Facts, Trust contests certain of these allegations, claiming that she was working "diligently" on a project with Julien, *see* Pl.'s SOF ¶ 16, that all of her hours were reported "accurately," *id.* ¶ 21, and that her "performance always met expectations." *Id.* ¶ 37.  However, at her deposition Trust admitted that she was not working the hours that were expected of her, and the Opposition offers nothing more than unsubstantiated denials that her performance was deficient.  Although Rule 56 requires that a district court construe all facts in the light most favorable to the nonmoving party, "[t]he party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of the pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." *R.R. Isla Verde Hotel Corp. v. Howard Johnson Int'l, Inc.*, 121 F. App'x 870, 871 (1st Cir. 2005).

[3] At her deposition, Trust stated that she refused to attend the staff meetings because she and her supervisors "didn't reconcile our differences," and "I was upset with what was going on." Dkt # 28, Ex. A, Trust Dep. at 50:6-18.

undermining the morale of other employees, initiated the University's progressive disciplinary process by issuing her a verbal warning on October 19, 2015. Pl.'s SOF ¶ 22. At a meeting called to discuss her performance issues, Trust left after less than ten minutes, claiming that "she was, essentially, sabotaged at the meeting and felt compelled to leave." *Id.* ¶ 23. Her managers then reissued the warning in writing, noting that Trust had failed to report to work at 53 Church Street since August 28, 2015, and had failed to report to Sever Library consistently during her scheduled hours. *Id.* ¶ 24. The warning also addressed her failure to attend staff meetings, laid out steps that she was expected to take to improve her performance, and set a deadline of November 18, 2015, to remedy her shortcomings. *Id.* ¶ 27. The warning cautioned that failure to do so could result in further disciplinary action, up to and including termination. *Id.* Julien testified that after the disciplinary process began, Trust stopped coming to work altogether. *See* Dkt # 28, Ex. B, Julien Dep. at 91:3-6 (testifying that the last time Julien saw Trust was in October of 2015 when he issued her the written warning). Angelini testified that following the verbal warning, "[t]here was no change [in Trust's behavior] . . . There were days when I would not see her at all." *Id.* Ex. C, Angelini Dep. at 33:1-7.

4

At the onset of the disciplinary process, Trust claims to have begun experiencing back problems resulting from disc protrusion.  Compl. ¶ 38.  However, she did not request accommodations for the disability until January 26, 2016.  Pl.'s SOF ¶ 47 (There is no evidence that Harvard was made aware of her disability claim prior to that date).  For whatever reason, Trust's work performance did not improve: she failed continuously to report for work during her scheduled hours, and she did not attend the staff meetings held between October 19 and December 18, 2015.  Pl.'s SOF ¶¶ 33, 35.  In response, Trust makes the puzzling claim that "[she] was not expected to work the schedule set out for her in her offer letter and in the [warning] letter provided to her on October 19, 2015."  *Id.* ¶ 33.

Harvard issued Trust a second written warning on December 18, 2015.  This warning specifically addressed her absenteeism and tardiness and her failure to meet the benchmarks laid out in the previous letter.  Trust was admonished that if she did not show improvement by January 18, 2016, further disciplinary action would be taken.  *Id.* ¶ 31.

In February of 2018, the disciplinary process was stayed when Trust sought, and was granted, medical leave pursuant to the Family Medical Leave Act (FMLA), and short-term disability leave (STD).  The leave was the outcome of negotiations that began when Trust first requested disability

accommodations on January 26, 2016. *Id.* ¶ 47. Trust requested that her leave begin on March 3, 2016, "so [she] could close everything, make sure everything was done before [she] went to Iran," Dkt # 28, Ex. A, Trust Dep. 55:1-9, where she planned to visit family and receive medical treatment.

Upon receipt of the leave request, Harvard's Disability Services Office notified Trust by email on February 17, 2016, of the supporting medical documentation that she would be required to submit. When Trust failed to respond to the initial email, Karen Millett of Disability Services wrote her a second time on February 22, 2016, enclosing a disability accommodation fact sheet. Millett informed Trust that any questions regarding FMLA or short-term disability benefits should be directed to Cherie Green, the Leave of Absence Coordinator. Millett also advised Trust that the interactive process required by the Americans with Disabilities Act (ADA) would begin once Disability Services received the required documentation from Trust's healthcare provider. Trust's physician provided Harvard with a note on February 25, 2016, stating that Trust had a "lumbar disc herniation," and was unable to perform certain job functions based on her "limited sitting tolerance." Pl.'s SOF ¶ 52. Harvard subsequently granted Trust a leave of absence until April 15, 2016. *Id.* ¶ 53.

Trust testified that at the time she received the initial leave approval, she planned to remain in Iran until June of 2016. Dkt # 28, Ex. A, Trust Dep. at 69:1-24. At some point (the record is unclear), Trust asked that her leave be extended until September of 2016. On April 19, 2016, Green emailed Trust, confirming receipt of the request to remain absent from work until September, and explaining that for Trust's position to remain open, her physician would need to supply Harvard's short-term disability insurer with additional medical information. Pl.'s SOF ¶ 56. The next day, Trust replied that she was overseas and would be unable to obtain the documentation until June at the earliest. *Id.* On April 27th – twelve days after Trust's approved leave had expired – Green again emailed Trust iterating that additional medical records and documentation were required before the request to extend her leave beyond April 15th could be considered. Trust replied the next day that "Medical documentation will be provided once I return to the US." *Id.*

As the twelve weeks of FMLA leave for which Trust was eligible was to expire on May 17, 2016, Anna Anctil, the FAS Senior Human Resources Consultant, informed Trust by email on May 10, 2016, that for her job to be held open, she would have to (1) provide Harvard's short-term disability insurer with documentation supporting her eligibility for continued short-

term disability benefits, or (2) provide Disability Services with documentation substantiating her need for additional leave as a reasonable accommodation for her disc protrusion disability.  Dkt # 27, Ex. B.  Trust responded by sending additional medical documentation, and her short-term disability benefits were extended until June 26, 2016.  However, in the month that elapsed between June 26, 2016, and July 20, 2016, Trust failed to document a need for a further extension of her leave.  *Id.*, Ex. C.

On July 21, 2016, Trust's physician wrote to Harvard supporting her request for an accommodation of her disc protrusion.   The doctor recommended that Trust be provided an "ergonomic chair, standing desk, [and] part-time schedule."  Pl.'s SOF ¶ 59.  Green responded by asking Trust, in a July 26, 2016 email, for clarification of (1) her physician's assessment of her functional limitation, the recommended part-time schedule, and predicted return to work date; and (2) her completed reasonable accommodation form (which she had still not submitted).   Dkt # 27, Ex. D.

On July 28, 2016, Trust – having returned from Iran – emailed Anctil attaching a completed reasonable accommodation form and notifying Harvard that she had a doctor's appointment scheduled for August 18, 2016. *Id.* Ex. E.  In that email, Trust expressed her frustration with Harvard's

repeated requests for documentation supporting an extension of her leave: "I can also assure you that to be on leave means (Goddess forbid) <u>NOT TO WORK and REST.</u>  I honestly don't know what resting means when I have to deal with the foul play of immature devolved adults." *Id.* (emphasis in original). Trust closed on an ominous note: "This is just the beginning.  With the interactive process coming, and having all these ill-intended adults negotiating . . . a Nebula will be born.  Soon all this nonsense will come to rest.  Samira."  Pl.'s SOF ¶ 61.  The attached form requested the following accommodations: "STD, LTD, Unpaid Leave, Mental Accommodation (no harassment, no threat, no intimidation while on leave and at work), continued flexible schedule, starting with part-time then back to full-time (maybe), treadmill desk (standing desk is included), ergonomic chair, telecommute." Dkt # 27, Ex. E at 3.

The following day, Millett, in a remarkable exercise of restraint, politely replied to Trust, explaining that under Harvard's ADA implementation policy, her doctor's recommendations required clarification. In order to "assist [Trust] in the process of determining possible reasonable accommodations," *id.*, Ex. F., Millett requested that Trust ask her physician for answers to the following questions:

1) What type of ergonomic chair is needed?
2) Is a treadmill desk needed separate from a standing desk?

3) What is the expected duration for a telecommute part time schedule?
4) How many hours per week and per day are you able to work?
5) How many days per week do you need to telecommute?
6) What is the expected return to work date?

Millett further informed Trust that in light of her scheduled doctors' appointment on August 18, 2016, an extension of her leave would be granted through August 20th.

Trust emailed Green – copying various people including Anctil and Millett – on August 23, 2016, insisting that "[m]y doctor faxed you the information you needed," and adding that "You already have a medical file on me.  More than what pertains to you."  *Id.*, Ex. G.  The email concluded on an angry note: "For the last 6 months on average you and Ann [Anctil] have pesterd [sic] me on getting documents every three weeks with ultimatum and threat.  I want you and Ann out of this interactive process. Get substitutes in for this if HR has to be in it . . .  Enough is Enough. Samira." *Id.*

On August 24, 2016, Trust forwarded a note from her physician to Millett.  The note stated: "Recommend:  Needs a standing desk, ergonomic chair.  Needs to change position frequently."  Pl.'s SOF ¶ 66.  The note did not mention the other accommodations that Trust had previously requested, including a flexible schedule and a treadmill desk.

On September 9, 2016, Trust emailed Millett asking why the additional accommodations she had requested, including a "treadmill desk, daily flexible schedule, telecommute, starting part-time then going back to full-time" were not being offered. *Id.* ¶ 68. Millett responded that the most recent note from her doctor did not ask for these additional accommodations. *Id.* However, Millett said that Harvard would provide her with an ergonomic chair and a standing desk in both of her work locations when she returned, and that she was "welcome to submit updated documentation" if her doctor's opinion about the necessary accommodations were to change.

That same day, September 9, 2016, Trust wrote an ultimatum to Julien, Angelini, Anctil, Green, and Millett stating: "I am NOT coming in Tues. <u>Morning</u> and my dishonest managers (and dishonest HR) know why. I am not going to argue/negotiate/discuss anything any further." Dkt # 28, Ex. A, Trust Dep. at Exhibit 11 & 13 (emphasis in original). When Trust finally returned to work on September 13, 2016, she did not attend the mandatory staff meeting, later testifying that she did so because her "supervisors were very unwelcoming and cold, and they didn't even acknowledge" her. *Id.*, Trust Dep. at 105:6-20. She also did not report t0 the Church Street location at 9:00 am, nor to Sever Library at 1:00 pm; instead, she testified that she

worked from 5:00 pm to 9:00 pm, *id.* 101: 5-7, on an unspecified project (her supervisors had not been able to assign her any work since she failed to arrive on site during her assigned hours).   Harvard then issued Trust a final warning.  Notwithstanding, Trust did not report for work on September 14, 2016, and was terminated effective September 15, 2016.

Throughout the course of Trust's employment, Harvard maintained a classification system for employees that determined their salary grades. Trust was hired as a Grade 54, while her colleagues in the same department were assigned a Grade 53.  Pl.'s SOF ¶ 72.  Each year, the FAS Classification Committee evaluated the employees' positions to determine whether Grade (and salary) increases were warranted based on the employee's skills, education level, experience, job responsibilities, and the complexity and scope of the employee's tasks relative to those of other employees.  *Id.* ¶ 71. Trust's position was subsequently reclassified from Grade 54 to 55; however, the positions of some of her colleagues received a larger increase in Grade. *Id.* ¶ 75.  Trust alleges that upward adjustments in the salaries of her male co-workers evidence sex discrimination on Harvard's part.

Trust filed this Complaint in Middlesex Superior Court on or about January 10, 2017; the case was removed to the federal district court on February 2, 2017.  The Complaint alleges that Harvard: (1) engaged in gender

and disability discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. (Title VII) and Mass. Gen. Laws ch. 151B (Chapter 151B) (Counts I and II); (2) failed to engage in the required interactive process in determining reasonable accommodations of Trust's disability in violation of Title VII and Chapter 151B (Count III); (3) retaliated against Trust in violation of Title VII and Mass. Gen. Laws ch. 151B and the FMLA, 29 U.S.C. §§ 2601-54 (Counts IV and VI); and (4) interfered with her rights under the FMLA (Count V).

## DISCUSSION

Summary judgment is appropriate where "there is no genuine dispute as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating a motion for summary judgment, the court draws "all reasonable inferences in favor of the non-moving party while ignoring conclusory allegations, improbable inferences, and unsupported

speculation." *Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009) (internal quotation marks and citation omitted).

Trust first contends that she was subjected to sex-based discrimination in violation of Mass. Gen. Laws ch. 151B and Title VII of the Federal Civil Rights Act of 1964.  This Count rests on the allegation that she was paid less than her male counterparts for doing essentially the same work. Discrimination claims are reviewed under the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, Trust must establish a *prima facie* case of discrimination: in the context of a claim of disparate impact, she must show that she was treated differently from individuals outside her protected class who were "situated similarly in all relevant respects." *Molloy v. Blanchard*, 115 F.3d 86, 91 (1st Cir. 1997).  At the second stage, the burden shifts to Harvard, which must articulate "a legitimate, nondiscriminatory reason for the employment decision." *Lewis v. City of Boston*, 321 F.3d 207, 213-214 (1st Cir. 2003). This is a burden of production rather than persuasion, as the burden of persuasion as to unlawful discrimination remains at all times with the plaintiff.  *Id.* at 214.  If Harvard articulates a legitimate, non-discriminatory reason for the employment decision in question, at the third stage the burden

then shifts back to Trust to demonstrate that Harvard's proffered reasons are "mere pretexts to hide . . . discrimination." *Id.*

This is the unusual case in which a plaintiff has failed to plead plausible facts sufficient to make out a *prima facie* case of gender discrimination. Rather, the uncontested evidence is that each position within Trust's department at FAS underwent a periodic review to determine its proper classification. The job descriptions of the positions held by Trust and her three male colleagues were distinct in significant respects. While several positions in the department shared the same title – "Lead User Assistant" – each of the Lead User Assistants had different job functions based on the Assistant's areas and levels of expertise, as well as, at times, different work schedules and different requirements for interacting with students and Harvard employees.[4] In order to establish a *prima facie* case, Trust must show that the male employees had similar "performance, qualifications and

---

[4] *Compare* Dkt # 27, Ex. F (Trust's Position Description) (responsible for, *inter alia*, monitoring "daily technical problem tickets for students") *with id.*, Ex. I (position descriptions of three male colleagues that she alleged received higher raises than she) (Anthony Sai – worked with outside contractors; scheduled, prepared, and troubleshot AV events; on-call on weekends to respond to unplanned AV issues); (David Zerega – responsible for "managing Video Production pipeline" and overseeing telephone support system); (Anthony Cahillane – responsible for "managing Enterprise Software Licensing").

conduct, without such differentiating or mitigating circumstances that would distinguish their situations." *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 17 (1st Cir. 1994).  The record belies any suggestion that this was the case in the department where Trust was employed.

Trust contends that her supervisor, Julien, rewrote the job descriptions of her male coworkers.[5]  According to Trust, a "disputed material fact exists as to whether Julien acted with discriminatory gender animus when he re-wrote all of the men's job descriptions so that they could get raises." Pl.'s Mem. in Opp'n to Summary Judgment, Dkt # 33 at 5.  There is, however, no evidence, not even the shoulder angel of a "stray remark," to suggest that Julien harbored a discriminatory animus towards female employees.  Nor is there any evidence that Harvard's classification decisions were based on a desire to promote male employees at the expense of Trust and other female workers.  *See Lockridge v. The Univ. of Maine Sys.*, 597 F.3d 464, 471 n.6 (1st Cir. 2010) ("'[U]nsupported speculation' . . . is insufficient to forestall summary judgment.") (citation omitted).

Recognizing the weakness of her case, Trust falls back on language from cases that take note of the relaxed entry-level burden on a plaintiff in a

---

[5] At her deposition, Trust testified that she was not aware at the time who was responsible for determining salary grades, and actually believed it was not her supervisors. Pl's SOF ¶ 78.

discrimination case – that the *prima facie* case is "not intended to be onerous," but is a "small showing" that is "easily made." *Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 39-40 (2005) (quoting *Che v. Massachusetts Bay Transp. Auth.*, 342 F.3d 31, 38 (1st Cir. 2003)).  This does not, however, mean that any showing at all will do no matter how flimsy or ephemeral it might be.  A barebones allegation of discrimination, without more, does not cut it, especially where a plaintiff has had the opportunity to take discovery. *See Sullivan*, 444 Mass. at 45 ("It is not onerous to require a plaintiff who has had the benefit of discovery to produce *some* evidence that the decision . . . . occurred in circumstances that raise an inference of unlawful discrimination.") (emphasis in original).  Summary judgment will therefore enter for Harvard as to Count I.

Trust's hostile work environment claims under Mass. Gen. Laws ch. 151B and Title VII fare no better.[6]  An employee advancing a hostile environment claim must show: (1) membership in a protected class; (2) that she was subjected to unwelcome harassment or mistreatment; (3) that such harassment had a causal nexus to her membership in the protected class; (4)

---

[6] I agree with Harvard that, since Title VII does not cover disability claims, *see Orell v. UMass Mem'l Med. Ctr.*, 203 F. Supp. 2d 52, 59 (D. Mass. 2002), Trust's claims fail as a matter of law insofar as they allege violations of Title VII rooted in the disability discrimination allegation.

that the conduct was sufficiently pervasive and severe to alter the terms and conditions of employment and create an abusive work environment; (5) that the conduct affecting the protected class was objectively and subjectively offensive; and (6) that some basis for employer liability has been established. *See Wilson v. Chertoff*, 699 F. Supp. 2d 364, 373 (D. Mass. 2010); *see also Bhatti v. Trs. of Boston Univ.*, 659 F.3d 64, 73 (1st Cir. 2011); *cf. Quiles-Quiles v. Henderson*, 439 F.3d 1, 7 (1st Cir. 2006) (noting that to establish a hostile work environment, plaintiff must show that her "workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of . . . [her] employment and create an abusive working environment.") (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)).

Even construing the facts in the light most favorable to Trust, she cannot meet her burden of making out a *prima facie* case.  The most that she alleges is that one of her supervisors, Angelini, used an inappropriate tone in some of the emails she sent Trust, reprimanding her for not reporting to her supervisors when she arrived for work.  Given that the record shows that Harvard had a legitimate concern over Trust's chronic absenteeism and tardiness, it begs the imagination to comprehend how emails chiding her for

not reporting to her supervisors when she arrived for work could amount to harassing conduct.

Trust's other arguments in opposition are equally conclusory and lacking in record support.[7] Such unsubstantiated assertions – in particular the effort to rebut her supervisors' concerns with the self-generated and self-serving assessment that her "performance always met expectations," Pl.'s SOF ¶ 38 – do not make the grade. *See, e.g., Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 261 (1st Cir. 1999) ("conclusory statements . . . cannot defeat summary judgment."); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-249 (1986) (at summary judgment, arguments and inferences must be supported by "specific facts"). Even if in some alternate universe the disapproving tone in which her supervisors at times expressed an expectation that as an employee Trust had a duty to show up for work were to be seen as severe or pervasive conduct, there is no evidence tying this

---

[7] While the court is required to construe the facts in the light most favorable to the non-moving party and to note factual disputes where they arise and where they may be relevant, the court is hampered in this task by the fact that many of Trust's statements in her Response to Defendant's Statement of Material Facts simply consist of contrary factual allegations without any citations to the record. Because a party must provide record support for factual allegations at the summary judgment stage, "the court will simply disregard any factual assertions that do not have appropriate citations to the record and specific evidentiary support." *Inman v. Siciliano*, 2012 WL 1980408, at *5 (D. Mass. May 31, 2012).

otherwise unremarkable expectation to Trust's status as a woman or a person with a disability.  Summary judgment will therefore enter for Harvard as to Count II.

Count III of the Complaint alleges that Harvard failed to make reasonable accommodations of Trust's disability, chiefly by failing to engage in the interactive process required by the ADA.  Upon learning of an employee's disability, an employer must "engage in a meaningful dialogue with the employee to find the best means of accommodating that disability." *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 104 (1st Cir. 2007). It would be monumentally unfair to Harvard to say that it failed to meet this requirement, notwithstanding Trust's protestations.  The record establishes that Harvard's Disability Services Office immediately contacted Trust upon receiving her request for an accommodation and explained the necessary documentation that she was required to provide.  Follow-up emails were sent several times over a nine month period – to the point that Trust complained about receiving too many requests for information substantiating her disability.  More telling is the fact that Trust received several extensions of her leave to allow the process to work towards fruition.

Finally, when Trust indicated her intention to return to work, she received numerous communications from University Disability Services in

an effort to identify the accommodations to be made for her, including those recommended by her physician. Notwithstanding, Trust failed to support her request for a "flexible" work schedule with a timely note from her doctor, nor did she ever indicate the precise hours that she desired to work. *See Freadman*, 484 F.3d at 103 (finding that plaintiff's "accommodation claim . . . founders due to her failure to produce evidence that would permit a jury to conclude that the employer was put on notice of a 'sufficiently direct and specific' request for her desired accommodation."). Even if Trust had substantiated her request for a flexible work schedule with appropriate medical documentation, the responsibilities of her job plainly required that she be on site, working with a team, and helping to troubleshoot IT problems as they arose. Because her apparent desire to work erratic hours at any time of day would not have been consistent with the essential functions of her job, such an accommodation would by definition have been unreasonable. *See Phelps v. Optima Health, Inc.*, 251 F.3d 21, 26 (1st Cir. 2001). Summary judgment will therefore enter for Harvard as to Count III.

In the remaining Counts of her Complaint, Trust attempts to tie her dismissal from the department to her effort to take FMLA leave[8] and to her

---

[8] Courts generally analyze FMLA retaliation and interference cases together when they arise out of the same set of facts. *See Chacon v. Brigham and Women's Hosp.*, 99 F. Supp. 3d 207 (D. Mass. 2015). In any event, even

having raised a complaint about sex discrimination.   These claims fail because Trust cannot establish a causal connection between the protected activity and any adverse employment action.[9]   *See Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 161 (1st Cir. 1998).   Rather, the record plainly demonstrates that Trust failed to meet even the most basic prerequisites of employment, such as reporting for work, and that she ignored repeated warnings that she faced possible termination if she did not change her ways. There is no evidence in the record that Harvard's adverse employment

---

if analyzed separately, Trust's FMLA interference claim, Count V, is meritless.   Trust claims that she was "bombarded with requests for additional doctor's [sic] letter, far and above what was actually necessary, as well as was told that her job was in jeopardy." Pl.'s Mem. at 13. This assertion is belied by the record, as Harvard's email correspondence merely advised her that her benefits were about to expire and that she needed to provide further documentation in order for her position to be kept open.   Such requests for additional documents are insufficient to constitute FMLA interference, since they were designed to advise Trust about what would happen *after* her FMLA leave – which had already been granted – was exhausted.   And even if the emails referenced the possible consequences of Trust's failure to provide adequate documentation substantiating her request for additional leave, suggesting that she might be at risk of losing her job, Trust would have known from the final warning that she had received that her job was in jeopardy irrespective of her FMLA leave.

[9] A *prima facie* case of FMLA retaliation requires a plaintiff to show that (1) she availed herself of a protected FMLA right; (2) she was "adversely affected by an employment decision"; and (3) "there was a causal connection between [her] protected conduct and the adverse employment action." *Orta-Castro v. Merck, Sharp & Dohme Química P.R., Inc.*, 447 F.3d 105, 113-114 (1st Cir. 2006).

decision had any relation to protected conduct, whether the taking of FMLA leave or complaining about unequal pay or disability discrimination. *See Henry v. United Bank*, 686 F.3d 50, 54 (1st Cir. 2012) (noting that the FMLA does not prohibit employers from disciplining employees or terminating them for cause).

The heart of the matter is this: it is manifest from the record that Harvard's reasons for terminating Trust were performance related, and she failed to make even a *prima facie* showing of retaliation or discrimination, or any other violation of her rights by Harvard.  Because courts do "not sit as super personnel departments, assessing the merits — or even the rationality — of employers' nondiscriminatory business decisions," *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991), the court has no reason to disturb Harvard's considered decision to terminate Trust for her unwillingness to abide by even the most commonplace requirements of her job.

## ORDER

Harvard's Motion for Summary Judgment is <u>ALLOWED</u> as to all Counts.  The Clerk will enter a final judgment for Harvard and close this case.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE